IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY BROWN (K51274),

        Petitioner,

v.

TERRY WILLIAMS,

        Respondent.

Case No. 14 C 3209

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Petitioner Anthony Brown, a prisoner at the Stateville Correctional Center, brings this *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging his 1996 state court convictions for murder, armed robbery, aggravated criminal sexual assault, and vehicular hijacking. For the reasons explained below, the Court denies the petition and declines to issue a certificate of appealability.

### I. Background

The following is taken from the state court record. The state court's factual findings are presumed correct, and Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C. § 2254(e)(1)).

#### A. The Underlying Offense

Petitioner was part of a group of five men who committed a double murder and carjacking on Chicago's Southside late on the evening of January 12, 1994. *Illinois v. Brown*, 705 N.E.2d 809, 812 (Ill. 1998) ("*Brown Direct Appeal*"). The men were

armed with a nine-millimeter handgun. *Id*. The victims, Reginald Wilson and Felicia Lewis, stopped Wilson's Chevrolet Blazer at a gas station at 79th Avenue and the Dan Ryan highway to use a bathroom. *Id*. at 811. With Wilson and Lewis was Steven Fitch, a friend. *Id*. Wilson and Lewis were in the Blazer when the carjacking occurred. *Id*. Fitch was walking back from the bathroom when he witnessed the carjacking in progress. *Id*. He fled after unsuccessfully attempting to confront one of the carjackers. *Id*. He called the police from a nearby pay phone. *Id*.

Petitioner was nearby, in his Chevrolet Caprice, when the carjacking occurred. *Id*. at 812. He drove the group to the carjacking. *Id*. Three of the assailants left Petitioner's Caprice to commit the carjacking while Petitioner and another offender waited in the Caprice. *Id*. The men picked the Blazer to carjack because they noticed the truck's wheel rims. *Id*.

The assailants drove the carjacked Blazer, along with Petitioner's Caprice, to a parking lot a few miles away at 47th and Vincennes. *Id*. Petitioner repeatedly raped Lewis in the back of his Caprice in the parking lot. *Id*. Petitioner forced Lewis to engage in both oral sex and vaginal intercourse. *Id*. at 812-13. Lewis told Petitioner that she was wearing a sanitary pad because she had given birth a few months earlier, and was also having her period. *Id*. at 813. Petitioner instructed Lewis to put her jacket on his car's backseat when he raped her. *Id*.

2

Petitioner returned Lewis to the Blazer and directed two of his cohorts to watch the victims in the Blazer while he and two of the other carjackers scouted a location to murder the victims. *Id.* After Petitioner left in his Caprice with the two other assailants, the two remaining carjackers opted instead to take the victims to a nearby garbage dumpster, where they shot Wilson twice in the head and shot Lewis twice in the side, killing both of them. *Id.*

Petitioner returned to find the victims murdered. *Id.* The group then went to an apartment where they divided the proceeds from the carjacking. *Id.* The group split cash, compact discs, cassette tapes, a CD player, and a car speaker system. *Id.*

A local resident found the victims' bodies in the dumpster the next day and contacted the police. *Id.* at 814. Police investigators discovered nine-millimeter cartridges in the dumpster by the victims. *Id.* Lewis's hands were tied with a bra. *Id.* The investigators also recovered Lewis's sanitary pad. *Id.* at 815.

That same day, the assailants drove the Blazer and the Caprice to Sauk Village, Illinois, where the Blazer was spotted by police. *Id.* at 813. The police stopped the Blazer and arrested two of the assailants, but Petitioner escaped in the Caprice back to Chicago. *Id.* Petitioner was arrested later that day by the Chicago police. *Id.* Fitch identified one of the assailants (not Petitioner) in a lineup at the police station. *Id.* at 812.

Petitioner had approximately $500 in cash on him when he was arrested, and a search of his Caprice revealed, among other items, a Kenwood cassette radio and a Panasonic CD Player. *Id*. at 814. The police found in the victims' vehicle, among other items, a Kenwood stereo instruction manual and faceplate and a Panasonic CD Player case. *Id*.

The initial testing of swabs taken from Lewis's body came back negative for the presence of semen. *Id*. A smear type stain of blood was found on the seat cushions on the backseat of the Caprice. *Id*. A small stain of human blood and seminal material was found on Petitioner's boxers. *Id*. However, the police laboratory could not obtain any DNA results. *Id*. at 815. The police technician, Pamela Fish, explained that the samples yielded no results, either because they were too small or because the DNA in the stains had degraded. *Id*.

Fingerprint and hair samples were taken from the Blazer and Caprice. *Id*. Nothing in the Blazer matched Petitioner, and nothing in Petitioner's Caprice matched Lewis. *Id*. Lewis' hair was not found on Petitioner's clothing, and Petitioner's hair was not found on Lewis. *Id*. One and one-half condom wrappers were recovered in the Blazer. [18-22] at 16.

Despite the lack of forensic evidence, a jury convicted Petitioner of two counts of first degree murder and one count each of aggravated vehicular hijacking, aggravated criminal sexual assault, and armed robbery. *Brown Direct Appeal*, 705 N.E.2d at 811. The state's primary witness was Zarice Johnson, one of the

4

carjackers, who entered into a plea agreement. *Id*. at 813. Johnson testified for the prosecution detailing Petitioner's role in the killings, rape, and carjacking. The victims' friend, Fitch, also testified about witnessing the carjacking. *Id*. at 811. The final major piece of evidence was that the proceeds from the carjacking – most notably the Panasonic CD player and Kenwood stereo – were recovered in Petitioner's car. *Id*. at 814.

Petitioner was sentenced to death for the murders, and concurrent 30-year sentences on the aggravated criminal sexual assault and aggravated vehicular hijacking charges. *Id*. at 811. The court imposed no sentence for the armed robbery conviction, as that offense merged with the vehicular hijacking. *Id*.

### B. Petitioner's State Postconviction Proceedings and Additional DNA Testing

The Supreme Court of Illinois affirmed petitioner's conviction and death sentence on direct appeal. *Id*. Petitioner's first postconviction petition was denied by the state trial court. His postconviction petition appeal was pending before the Supreme Court of Illinois when then-Governor George Ryan commuted his death sentence to life in prison without the possibility of parole. [18-8] at 5. The parties agreed that the commutation mooted Petitioner's postconviction appeal because the appeal was limited to challenges to the death sentence. [18-7] at 3; [18-8] at 2. The Supreme Court of Illinois agreed, and dismissed the appeal. *Illinois v. Brown*, No. 89435 (Ill. Apr. 4, 2003) [18-9].

5

Petitioner then brought a motion for additional DNA testing pursuant to 725 ILCS 5/116-3. *Illinois v. Brown*, 988 N.E.2d 1063, 1068 (Ill. App. Ct. 2013) ("*Brown Successive Postconviction Appeal*"). The DNA testing discovered sperm present in the vaginal sample from Lewis, as well as on Lewis's sanitary pad. *Id*. at 1069-70. The testing excluded Petitioner and the four other perpetrators as the source of the sperm. *Id*. at 1070-71. Lewis's husband, Antoine Hudson, was identified as a possible source of the sperm found in the vaginal and sanitary pad samples. *Id*. at 1072-73.[1]

Based on the new DNA results, Petitioner brought a second state postconviction petition arguing that he was actually innocent. *Id*. at 1068. To rebut Petitioner's actual innocence argument, the State obtained an affidavit from Hudson. Hudson explained that he and Lewis were married in September 1992, but went through periods when they did not see each other because she was serving in the Army outside of Illinois. *Id*. at 1073. Hudson said that he and Lewis did have sexual relations at times when she returned to Illinois. *Id*. Hudson stated that she returned to Chicago in late 1993, and that they had sexual intercourse periodically

---

[1] Three experts opined that Hudson could be the source, or could not be excluded as the source, of the DNA found in the vaginal and sanitary pad samples. *Brown Successive Postconviction Appeal*, 988 N.E.2d at 1071. One expert opined that Petitioner's co-defendants could all be excluded as the source of the male DNA found on the vaginal swabs and the sanitary napkin. *Id*. DNA testing was also done on a swatch of material taken from Petitioner's boxer shorts; that testing revealed more than one source of DNA: the primary DNA profile obtained from the sample matched the swab labeled with Petitioner's name, but Lewis could not be excluded as a secondary source of the DNA obtained from this sample. *Id*. at 1068-69.

from the time she returned until her murder in January 1994. *Id.* There was no evidence suggesting that Hudson had anything to do with the crimes with which Petitioner was charged.

The state court rejected Petitioner's second postconviction petition. The court concluded that the presence of Hudson's DNA, and the absence of Petitioner's DNA, did not exonerate Petitioner. *Id.* at 1076. Petitioner then filed the present habeas corpus petition.

## II. Analysis of Petitioner's Claims

The present habeas corpus petition raises six claims: (1) ineffective assistance of trial counsel due to (a) failure to call his mother as an alibi witness; (b) failure to retain forensic experts to examine DNA evidence; and (c) failure to investigate why the initial DNA testing did not produce a result; (2) ineffective assistance of appellate counsel for failing to argue that crying by the victims' family member in front of the jury prejudiced Petitioner; (3) the state court erred in dismissing his successive postconviction actual innocence claim based on the DNA testing results;[2] (4) prosecutorial misconduct in the closing argument; and, (5) he was wrongfully denied the ability to speak at sentencing.[3] Respondent has answered the Petitioner, [17], and Petitioner was given leave to reply in support of his petition. [26]. Although

---

[2] Petitioner challenges the state court denial of his claim for a new trial based on the DNA evidence in two claims, labeled as Claims Three and Four. The Court has combined these claims into one claim, Claim Three, as the two claims involve one common issue.

[3] Respondent reordered Petitioner's claims in his response to the habeas corpus petition. The Court addresses the claims in the order presented in the petition.

he was given leave to do so, *see* [16], [26], Petitioner did not file a reply and did not otherwise contact the Court by the set deadline. Thus, the Court will proceed with its consideration of the habeas corpus petition without the benefit of any additional input from Petitioner.

## A. Claims One, Two and Four

Respondent correctly argues that Claims One (ineffective assistance of trial counsel), Two (ineffective assistance of appellate counsel), and Four (prosecutor's comments during closing arguments) are procedurally defaulted. To obtain federal habeas review, a state prisoner "must first submit his claim through one full round of state-court review." *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971)). Petitioner must present the operative facts and controlling law of the claim before the state courts so that they have a meaningful opportunity to consider the claim before it is raised in federal court. *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006) (citations omitted). Petitioner must raise the claim through all levels of the Illinois courts, including in a petition for leave to appeal (PLA) before the Supreme Court of Illinois. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-46 (1999)).

Furthermore, although ineffective assistance of counsel is a single claim, *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)), Petitioner must raise the particular factual basis for

8

each aspect of the alleged ineffective assistance of counsel to preserve the respective argument. *Pole*, 570 F.3d at 935 (citing *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007)). "A bare mention of ineffective assistance of counsel is not sufficient to avoid a procedural default; [Petitioner] must have 'identified the specific acts or omissions of counsel that form the basis for [his] claim of ineffective assistance.'" *Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (quoting *Momient-El v. DeTella*, 118 F.3d 535, 541 (7th Cir. 1997)). "Petitioner cannot argue one theory [of ineffective assistance of counsel] to the state courts and another theory, based on different facts, to the federal court." *Johnson*, 574 F.3d at 432 (citing *Everett v. Barnett*, 162 F.3d 498, 502 (7th Cir. 1998)).

Claims One and Two (respectively, (ineffective assistance of trial counsel and ineffective assistance of appellate counsel) are procedurally defaulted because they were not presented in the state courts as required. These claims were raised for the first time in the habeas corpus petition.

Claim Four (prosecutorial misconduct during closing arguments) is defaulted because the Illinois courts reviewed the claim under plain error. Petitioner failed to preserve the claim in the trial court, raising it for the first time on direct appeal. The Illinois Supreme Court concluded that the claim was defaulted, and reviewed it under plain error review. *Brown Direct Appeal*, 705 N.E.2d at 821. The plain error holding is an adequate and independent state law ground, resulting in the procedural default. *Gray v. Hardy*, 598 F.3d 324, 329 (7th Cir. 2010).

9

As a rule, a state prisoner's habeas claims "may not be entertained by a federal court 'when (1) a state court has declined to address those claims because the prisoner has failed to a meet a state procedural requirement; and (2) the state judgment rests on independent and adequate state procedural grounds.'" *Maples v. Thomas*, 132 S. Ct. 912, 922 (2012) (quoting *Walker v. Martin*, 562 U.S 307, 315 (2011); *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991)).

To be independent, the state court must have actually relied upon the procedural bar as an independent basis for the disposition of the case. *Lee v. Foster*, 750 F.3d 687, 693 (7th Cir. 2014) (citation omitted). Here, the Illinois Supreme Court was clear in its reliance upon the state law plain error ground. *Brown Direct Appeal*, 705 N.E.2d at 821.

To be adequate, the state rule must be "'firmly established and regularly followed.'" *Walker*, 562 U.S. at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009)). Illinois's plain error rule is well established and permits a finding of procedural default. *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005). Claim Four is defaulted.

Petitioner cannot excuse his procedural default on Claims One, Two, or Four by demonstrating either cause and prejudice or a fundamental miscarriage of justice. Respondent raised the procedural default argument in his answer. *See* [17]. Petitioner was given an opportunity to file a reply to respond to the procedural default argument. *See* [26]. Petitioner failed to file any reply. Thus, he is barred

10

from raising these arguments in response to the procedural default. *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 555 n.6 (7th Cir. 2001). For completeness, the Court also notes that, even if the forfeiture were forgiven, Petitioner could not excuse his defaults under either the cause and prejudice standard or the fundamental miscarriage of justice standard.

Regarding cause and prejudice, cause is an "'objective factor, external to [Petitioner] that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or, (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)). The first two types of cause are not applicable to this case, and Petitioner has not argued the third. In any event, for counsel's ineffective assistance to amount to "cause" excusing the default of an underlying issue, the ineffective assistance of counsel claim must itself be properly preserved in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Here, it was not.

This leaves Petitioner with the fundamental miscarriage of justice (actual innocence) gateway to excuse his default. Proving actual innocence in this context requires Petitioner to demonstrate that "'in light of the new evidence, no juror, acting

reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggins v. Perkins*, 133 S. Ct. 1924, 1928 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggins*, 133 S. Ct. at 1928 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial − such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence − to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")).

Although Petitioner has not argued actual innocence to excuse his procedural default, he argues in Claim Three that the state court erred in rejecting his successive postconviction petition claim that he is actually innocent. His actual innocence claim, however, is belied by the record. Proceeds from the carjacking were recovered from Petitioner's car. The police recovered, among other items, the victims' Panasonic CD player and Kenwood stereo from Petitioner's car. At trial, Fitch identified the CD player and stereo recovered in Petitioner's car as belonging to the victims and coming from the Blazer. *Brown Direct Appeal*, 705 N.E.2d at 818. And police found the CD player's case and the stereo's storage case and instruction

manual in the Blazer. The CD player and the stereo found in Petitioner's car link him to the crime.

The fact that Petitioner's DNA was not found on the victims, or at the crime scene, does not demonstrate that he is actually innocent. Regarding the criminal sexual assault conviction, "physical evidence, such as trauma or even the presence of DNA, is not necessary to maintain a sexual assault conviction." *Illinois v. Bergamino*, No. 2015 IL App (1st) 142387-U, 2015 WL 9273445, at *12 (Ill. App. Ct. Dec. 18, 2015) (citations omitted). Johnson's testimony that Petitioner raped Lewis was sufficient for the jury to find Petitioner guilty.

As the Supreme Court of Illinois recognized on direct appeal, Johnson's testimony implicating Petitioner in the murders, rape, and carjacking was corroborated in numerous respects. Johnson's testimony regarding the carjacking at the gas station was consistent with Fitch's eyewitness testimony regarding the events. *Brown Direct Appeal*, 705 N.E.2d at 818. Johnson's testimony regarding how the victims were murdered was consistent with the physical evidence recovered by the police at the dumpster. Johnson testified accurately regarding the number of times each victim was shot, where their bodies were left, and the type of weapon used. *Id*. Johnson also detailed that Lewis was wearing a sanitary napkin, and he testified that the assailants took cash, the CD player and the stereo, CDs and cassette tapes from the Blazer. The police recovered the sanitary napkin, and they

13

recovered the CD player and the stereo, as well as CDs and tapes from Petitioner's car; Petitioner also had a wad of cash on him when he was arrested.

Despite this, Petitioner argues that the DNA evidence demonstrates that he is innocent. Petitioner argues that the fact that his DNA was not recovered from Lewis means that he did not commit the sexual assault. He also argues that Johnson lied about his involvement.

The fact that Petitioner's DNA was not found on Lewis or on the sanitary pad sample, while Hudson's DNA was found, does not demonstrate that Johnson lied. Initially, the lack of DNA evidence does not establish innocence. Condom wrappers were found in the Blazer. [18-22] at 16. And Hudson was Lewis' husband and he explained that he and Lewis had sexual relations before her murder. These facts would explain the presence of Hudson's DNA and the absence of Petitioner's DNA. Yet there is no evidence that Hudson was involved in any way with the crimes for which Petitioner was charged, and the presence of his DNA does not exonerate Petitioner.

On the record before the Court, Petitioner cannot demonstrate actual innocence. Johnson's testimony implicated Petitioner in these crimes and his testimony was substantially corroborated by Fitch's eyewitness testimony and the physical evidence recovered by the police, including the victims' belongings, which were found in Petitioner's car. Absent a demonstration of actual innocence, Petitioner's procedural default on Claims One, Two and Four may not be excused.

14

## B. Claim Three

Petitioner argues in Claim Three that the state courts erred in dismissing his successive postconviction petition claim of actual innocence. The Supreme Court, while leaving the question open, has expressed considerable doubt as to whether actual innocence is a cognizable constitutional claim. *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71-72 (2009) (citing *House*, 547 U.S. at 554-55; *Herrera v. Collins*, 506 U.S. 390, 398-417 (1993)). The uncertainty as to whether actual innocence is a free standing constitutional claim dooms Claim Three because Petitioner is entitled to relief only if the state court ruling is contrary to, or an unreasonable application of, clearly established federal law from the Supreme Court of the United States in effect at the time of the relevant state court decision. 28 U.S.C. § 2254(d)(1); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). There is no clearly established federal law from the Supreme Court supporting Petitioner's actual innocence claim.

Additionally, even if there were clearly established federal law from the Supreme Court recognizing actual innocence as a cognizable claim, as explained above, Petitioner's actual innocence argument is meritless. The Court rejects Claim Three.

## C. Claim Five

Petitioner argues in Claim Five that he was denied the right to speak at his sentencing. Petitioner argues that one of the other carjackers, Stanley Hamelin,

15

was allowed to speak when he was sentenced, and received a lesser sentence as a result. Petitioner argues that, because he was denied the right of allocution, he was unable to show his remorse to the sentencing judge and, as a result, received a more severe sentence than he otherwise would have.

Respondent argues that Petitioner's claim is moot because his death sentence was commuted by then-Governor George Ryan, and commutation moots this type of challenge. Not so. The fact that Petitioner's sentence was commuted does not automatically moot his claim. Rather, the Court must consider whether Petitioner would receive a lower sentence if he obtained relief on his claim. *Simpson v. Battaglia*, 458 F.3d 585, 595 (7th Cir. 2006) (holding that sentencing claim was not moot when death sentence commuted by Governor Ryan because prisoner could obtain a sentence as low as 20 years imprisonment if he obtained relief on sentencing claim and was resentenced).

Petitioner's claim, however, is moot for another reason: Illinois law imposes a mandatory life sentence without the possibility of parole when the defendant murders more than one person. 730 ILCS 5/5-8-1(a)(1)(c)(ii); 730 ILCS 5/3-3-3(d); *Illinois v. Davis*, 6 N.E.3d 709, 714 (Ill. 2014). Thus, even if he were to win on his claim, Petitioner would receive the same sentence: life without the possibility of parole.[4]

---

[4] Respondent did not raise this argument, suggesting at first blush that it is waived. The issue of mootness, however, goes to subject matter jurisdiction. *See Pakovich v. Verizon LTD Plan*, 653 F.3d 488, 492 (7th Cir. 2011). And issues involving this Court's subject

Moreover, even if Petitioner's claim were not moot, it would nonetheless fail on its merits. There is no constitutional right to address a court before it imposes a sentence. *Hill v. United States*, 368 U.S. 424, 428 (1962); *Hawkins v. United States*, 706 F.3d 820, 825 (7th Cir. 2013). Claim Five is denied.

### III. Certificate of Appealabilty

The Court declines to issue a certificate of appealability under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts. Petitioner cannot make a substantial showing of the denial of a constitutional right, or that reasonable jurists would debate, much less disagree, with this Court's resolution of this case. *Resendez v. Knight*, 653 F.3d 445, 446-47 (7th Cir. 2011) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. If Petitioner wishes the Court to reconsider its judgment, however, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e).

---

matter jurisdiction are not subject to forfeiture or waiver. *Moore v. Olson*, 368 F.3d 757, 759 (7th Cir. 2004.

The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

**IV. Conclusion**

Petitioner's habeas corpus petition [1] is denied on the merits. Any pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to enter a judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

Dated: November 21, 2016

                              ENTERED:

                              John Robert Blakey
                              United States District Judge